RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 23a0255p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

THOMAS BALTRUSAITIS; GUILLERMO ANTUNEZ; PATRICK BARTH; RICHARD BROECKER; RYAN BUDEK; TUYEN CHU; DARRYL CRAIG; SATISH DOSHI; JOHN FLETCHER; EMORY GASPERAK; JON HUTCHINSON; ALAN R. JARZEMBOWSKI; FRANK KOTSONIS; SANDRA D. LANGE; ARTHUR LAURIN; KEVIN LUCZAK; TIM MAURO-VETTER; REGINALD MCINTYRE; CARL OBERNDORFER; JEROME PEACOCK; EJAZ RAHMAN; CHARLIE RICKMAN; MARK ROSINSKI; GREG RYNTZ; MICHAEL SAVOSKY; BRIAN SCHIFFMAN; FRED SCHNELL; GREGORY SKONIECZNY; LISA SOWINSKI; SURAJ TANDON; CHANCE TESS; JAMES VIRIGLIO; BRIAN WARDA; COREY WATKINS; DANNY WOODRUFF; HAROLD WRIGHT; JOHN ZELL; JAMES ZIEMIANSKI,

        *Plaintiffs-Appellants*,

    *v*.

INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA; FCA US, LLC; ALPHONS IACOBELLI; JEROME DURDEN; MICHAEL BROWN; DENNIS WILLIAMS; GARY JONES; NORWOOD H. JEWELL; VIRDELL KING; KEITH MICKENS; JOHN DOES 1–10,

        *Defendants-Appellees*.

┐
│
│
│
│
│  No. 22-1383
│
│
│
│
┘

─────────────────

Appeal from the United States District Court for the Eastern District of Michigan at Port Huron.
No. 3:20-cv-12793—Robert H. Cleland, District Judge.

Argued: July 20, 2023

Decided and Filed: November 22, 2023

Before: GILMAN, LARSEN, and NALBANDIAN, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Kenneth D. Myers, Cleveland, Ohio, for Appellants. Elisabeth Oppenheimer, BREDHOFF & KAISER, PLLC, Washington, D.C., for Appellee UAW. Julia M. Jordan, SULLIVAN & CROMWELL, LLP, Washington, D.C., for Appellee FCA. **ON BRIEF:** Kenneth D. Myers, Cleveland, Ohio, for Appellants. Elisabeth Oppenheimer, Jacob Karabell, BREDHOFF & KAISER, PLLC, Washington, D.C., for Appellee UAW. Julia M. Jordan, SULLIVAN & CROMWELL, LLP, Washington, D.C., Steven L. Holley, Jacob E. Cohen, Justin M. Zaretzky, SULLIVAN & CROMWELL LLP, New York, New York, Brian M. Schwartz, MILLER, CANFIELD, PADDOCK & STONE, PLC, Troy, Michigan, for Appellee FCA. Michael A. Nedelman, NEDELMAN LEGAL GROUP, PLLC, Farmington Hills, Michigan, for Appellee Iacobelli. Judith S. Gracey, THE GRACEY LAW FIRM, PLLC, Keego Harbor, Michigan, for Appellee Durden.

_____

**OPINION**

_____

LARSEN, Circuit Judge. Plaintiffs are current and former engineers employed by automaker FCA US LLC (now Stellantis). In 2011, FCA transferred the work that plaintiffs had previously performed at FCA's company headquarters to a new location. Plaintiffs were unhappy with the transfer, and in 2015 they filed a grievance with their union, the United Auto Workers (UAW). The UAW failed to pursue it. In 2017, plaintiffs filed essentially the same grievance, but the UAW again did not pursue it. By this time, plaintiffs had learned of a massive bribery scheme involving FCA and the UAW. Plaintiffs believed that those bribes had affected the 2011 job-relocation process, as well as the UAW's treatment of their grievances. In 2018, plaintiffs filed the same grievance again. Nearly two years later, the UAW found the grievance meritorious. Plaintiffs then sued FCA, the UAW, and various individual defendants in October 2020, raising claims under the Labor Management Relations Act (LMRA) and the Racketeer Influenced and Corrupt Organizations Act (RICO). Defendants moved to dismiss, arguing that the statute of limitations barred both claims. The district court agreed and dismissed the complaint. For the reasons stated, we AFFIRM.

I.

Because this case is at the Federal Rule of Civil Procedure 12(b)(6) stage, "the factual allegations in the complaint are what matter." *Gen. Motors, LLC v. FCA US, LLC*, 44 F.4th 548, 551 (6th Cir. 2022). We quote them liberally and accept them as true. *Id.*

Plaintiffs are 47 current and former engineers employed by FCA in the Advance Manufacturing Engineering Powertrain (AMEPT) division. In late 2011, then-FCA Vice President of Employee Relations Alphons Iacobelli transferred "the work performed by the AMEPT division at the Chrysler Technical Center (CTC) located at FCA's company headquarters in Auburn Hills, Michigan, to the [Trenton Engine Complex] in Trenton, Michigan." R. 4, Amended Complaint, PageID 337.

Plaintiffs were unhappy with the transfer. "[I]t added significant time to their daily commutes, approximately an hour each way, in addition to the increased fuel costs and vehicle wear and tear." *Id.* at 338. What's more, plaintiffs "did not receive a relocation allowance." *Id.* Shortly "after the transfer began, plaintiffs became aware that [various] transfer provisions of the collective bargaining agreement were being violated." *Id.* Other workers, including most of AMEPT management, continued to work out of the CTC, or nearby locations; and "those who avoided the long commute to Trenton had more time available to work overtime assignments." *Id.* at 339. Plaintiffs raised other concerns with the transfer, including the unfair use of company cars and what plaintiffs believed "to be an increase in the number of non-bargaining unit (NBU) employees doing bargaining unit work." *Id.* at 340. In addition, the "long commute to Trenton and low morale attributable to unequal implementation of the transfer" caused a decline in the number of salaried-bargaining-unit (SBU) employees in the group. *Id.* UAW leadership did nothing, taking "company-friendly positions on a number of issues" and not properly handling grievances filed by plaintiffs. *Id.* at 340–41. According to plaintiffs, "prior local union leadership enjoyed privileges such as increased access to overtime as a result of their acquiescence to management in union matters." *Id.* at 341.

In 2015, plaintiffs filed a grievance regarding the 2011 transfer, seeking $30,000 in compensation for each affected employee. That "grievance was not pursued by the union

beyond the second step" of the internal union grievance process. *Id.* In 2017, plaintiffs filed another grievance related to the job relocation on behalf of all employees in the transferred group. This time, plaintiffs alleged that the "illegal Transfer of Operations" was the result of collusion between FCA and "corrupt UAW officials." *Id.* at 341–42. Plaintiffs sought $172,800 in compensation for each employee, "as well as a $45,000 car voucher per employee to compensate for added mileage placed on their vehicles." *Id.* at 342. Plaintiffs "also requested that employees be relocated back to CTC" along with "all work traditionally performed by SBU employees." *Id.*

The collusion allegations in the 2017 grievance stemmed from "the government's indictment of Alphons Iacobelli on July 26, 2017 for violation of federal labor law and tax evasion." *Id.* That indictment revealed that "from about 2009 until the Iacobelli indictment was made public in 2017, high-level FCA officials had been paying bribes to UAW officials in exchange for the UAW negotiating company-friendly contracts and acting in the company's interests on grievances." *Id.* at 343. According to plaintiffs, the indictment was the first "public acknowledgment" of any government investigation into the scandal and the first information they "had that their complaints and grievances had been affected by bribery between FCA and the UAW." *Id.* Plaintiffs alleged:

> Unbeknownst to plaintiffs at the time when plaintiffs were transferred in 2011, or when they complained to the company about uneven implementation of the transfer process in 2012, or when they complained repeatedly to their union leadership, or when they watched as grievances were not properly handled, or when they filed a grievance in 2015, high-level officials at [FCA] and the UAW were engaging in a wide-ranging, long-lasting criminal bribery scheme aimed at saving [FCA] millions of dollars by having the union take company-friendly positions, i.e., interpreting contractual language in a way that deprived [FCA] employees, like plaintiffs, of fair representation and derailing the exact type of grievances that plaintiffs were attempting to bring.

*Id.* at 346.

FCA responded to the 2017 grievance, saying that it was untimely and lacked merit. Plaintiffs moved the grievance to the next step in the internal review process, but FCA gave the same response and "also asserted that the grievance was the same as the one filed in 2015." *Id.*

at 344.  The UAW then withdrew the grievance at "the next stage in the process." *Id.*  Plaintiffs learned of this on November 3, 2017, and appealed internally on December 8, 2017.  The appeal was deemed untimely, and plaintiffs did not pursue further review.

On February 2, 2018, plaintiffs filed another grievance, essentially identical to the 2017 one.  The 2018 grievance followed a path similar to the 2017 grievance, but this time, plaintiffs timely appealed the union's withdrawal of the grievance.  At the last step in the UAW's internal appeal process, the union determined that plaintiffs had done enough to discharge "their obligation to exhaust internal union remedies" and could "proceed with any external processes or remedies available to them." *Id.* at 346.

On October 16, 2020, plaintiffs sued FCA, the UAW, and various officials, including Iacobelli.  Plaintiffs brought two RICO claims, claims for federal and state civil conspiracy, a fraud claim, and two LMRA hybrid claims, for breach of the CBA and for violation of the duty of fair representation.  All defendants moved to dismiss under Federal Rule of Civil Procedure 12(b)(6).  Plaintiffs responded and voluntarily dismissed their federal civil-conspiracy claim.  The district court granted the defendants' motions to dismiss, concluding that the statute of limitations barred both the LMRA and RICO claims.  The court declined to exercise supplemental jurisdiction over plaintiffs' state-law claims.

Plaintiffs timely appealed, challenging the dismissal of their LMRA and RICO claims.

II.

We review de novo the district court's order dismissing plaintiffs' complaint for failure to state a claim under Rule 12(b)(6).  *Rossborough Mfg. Co. v. Trimble*, 301 F.3d 482, 489 (6th Cir. 2002).  "We construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations as true, and examine whether the complaint contains 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 382–83 (6th Cir. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

A.

Plaintiffs first challenge the dismissal of their LMRA claims as time-barred. Section 301 of the LMRA allows federal courts to hear "[s]uits for violation of contracts between an employer and a labor organization representing employees." 29 U.S.C. § 185(a). "It encompasses suits by and against individual employees as well as between unions and employers." *Swanigan v. FCA US, LLC*, 938 F.3d 779, 784 (6th Cir. 2019) (citation omitted). Plaintiffs here have brought a "hybrid claim," so they "must prove both (1) that the employer breached the collective bargaining agreement and (2) that the union breached its duty of fair representation." *Id.* (citation omitted). "[T]he two claims that make up a hybrid claim are 'inextricably interdependent.'" *Id.* (quoting *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 164 (1983)).

Plaintiffs' hybrid LMRA claims are subject to a six-month statute of limitations. *See* 29 U.S.C. § 160(b); *DelCostello*, 462 U.S. at 172. "A hybrid § 301/fair representation claim accrues against both the union and the employer when the employee knew or should have known of the acts constituting either the employer's alleged violation or the union's alleged breach." *Lombard v. Chrome Craft Corp.*, 264 F. App'x 489, 490–91 (6th Cir. 2008); *see also Bowerman v. UAW*, 646 F.3d 360, 366 (6th Cir. 2011).

Our cases make clear that plaintiffs' LMRA claims were untimely. Plaintiffs pursuing a hybrid claim must sue once they "reasonably should know that the union has abandoned" their claim. *Saunders v. Ford Motor Co.*, 879 F.3d 742, 751 (6th Cir. 2018) (citation omitted). In *Saunders*, the limitations period began when the union decided not to pursue the employee's grievance at "the second stage of the grievance process," which "end[ed] the Grievance Procedure and dispos[ed] of the grievance." *Id.* at 752. In *Noble v. Chrysler Motors Corp.*, the limitations period began "when the union steward refused to pursue [plaintiffs'] claim" because that was "the latest date at which plaintiffs should have known of the union's breach." 32 F.3d 997, 1001 (6th Cir. 1994). And in *Robinson v. Central Brass Manufacturing Co.*, the limitations period began "when the deadline for requesting arbitration passed without action by the Union." 987 F.2d 1235, 1239 (6th Cir. 1993).

Here, the statute of limitations began to run in 2015. That year, plaintiffs filed a grievance regarding the 2011 transfer, seeking $30,000 in compensation for each affected employee. That "grievance was not pursued by the union beyond the second step" of the grievance process. R. 4, Amended Complaint, PageID 341. At that point, plaintiffs knew that the UAW had "abandoned" their claim, and the limitations period began to run at that time. *Saunders*, 879 F.3d at 751–52. Plaintiffs had six months to file their lawsuit but waited until October 2020. The LMRA's six-month statute of limitations thus bars plaintiffs' LMRA claims stemming from the 2015 grievance.

Plaintiffs contend, however, that the 2017 and 2018 grievances reset the clock. This argument plainly fails with respect to the 2017 grievance. The UAW withdrew that grievance on November 3, 2017, and plaintiffs appealed internally on December 8, 2017. The appeal was deemed untimely, and plaintiffs didn't pursue further review. So even if the 2017 grievance could have reset the clock, the limitations period on the 2017 grievance began to run sometime near the end of 2017, rendering plaintiffs' 2020 complaint untimely.

The 2018 grievance requires additional consideration. If we assume that the limitations period was tolled while plaintiffs utilized internal procedures, *see Robinson*, 987 F.2d at 1242, then the limitations period for the 2018 grievance began on May 6, 2020, when plaintiffs had exhausted all internal remedies. Plaintiffs would have had until sometime in early November 2020 to file their complaint, rendering their October 16, 2020 complaint timely. The district court concluded, however, that the 2018 grievance was a mere recast of the 2015 grievance and that "Plaintiffs [could not] rely on the filing of yet another grievance in 2018 to dodge the LMRA's short six-month statute of limitations." *Baltrusaitis v. UAW*, 2022 WL 868423, at *5 (E.D. Mich. March 23, 2022); *see also Plunkett v. Smurfit-Stone Container Corp.*, 247 F. App'x 604, 606 (6th Cir. 2007) ("[T]he plaintiff cannot toll the statute of limitations by repeatedly filing grievances on the same issue." (citation omitted)). We agree.

Plaintiffs argue that the 2018 grievance differed from the 2015 grievance because it contained new allegations that the bribery scheme had affected the UAW's handling of the job relocation. They urge us to follow the UAW's internal Public Review Board, which concluded that the 2018 grievance was timely because plaintiffs couldn't have known earlier of the bribery

scheme that caused the misconduct. But as explained previously, plaintiffs' complaint shows that they knew shortly after the job relocation that FCA was not following the CBA's transfer requirements and knew of the UAW's willingness to side with FCA and its unwillingness to assist plaintiffs.

New allegations of bribery and corruption don't change that result. They merely explain facts that plaintiffs already knew—that the UAW was acting contrary to plaintiffs' interests. And the bribery and corruption themselves cannot support plaintiffs' § 301 claim. Bribery and corruption are the subject of § 302 of the LMRA, which prohibits bribery between an employer and a union. 29 U.S.C. § 186. That criminal provision, however, contains no private right of action. *See Ohlendorf v. United Food & Comm. Workers Int'l Union*, 883 F.3d 636, 640, 641–42 (6th Cir. 2018). And an employee may not repackage a § 302 claim as a § 301 claim. *See Swanigan*, 938 F.3d at 785. "Plaintiffs cannot shoehorn what is truly a criminal-bribery matter under the Act into an inapplicable civil provision." *Id.* So the allegations of bribery and corruption alone are not actionable, and the conduct underlying the 2018 grievance is identical to that of the earlier grievances. Plaintiffs offer no authority suggesting that they may reset the limitations clock by filing repeated grievances based on the same underlying conduct.

Equitable tolling due to fraudulent concealment does not save plaintiffs' LMRA claims either. Even if plaintiffs could establish fraudulent concealment, the district court reasonably concluded that "such tolling clearly ended after the July 2017 federal indictment publicly exposed the allegations of corruption that form the basis of Plaintiffs' current claim[s]." *Baltrusaitis*, 2022 WL 868423, at *5. That does nothing to save plaintiffs' 2020 complaint, which came almost three years after the clock would have begun to run in early 2018. *Cf. DeShetler v. FCA US, LLC*, 790 F. App'x 664, 672 (6th Cir. 2019) (rejecting equitable-tolling argument that was premised on FCA's and the UAW's bribery scheme).

The district court didn't err by concluding that plaintiffs' LMRA claims were barred by the six-month statute of limitations.

B.

Plaintiffs also brought two RICO claims, "alleg[ing] that Defendants committed racketeering violations by participating in a bribery scheme that violated the LMRA with the intent of lowering FCA's labor costs by transferring the Plaintiffs' work locations." *Baltrusaitis*, 2022 WL 868523, at \*6. RICO claims are subject to a four-year statute of limitations. *See Agency Holding Corp. v. Malley–Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987).

In *Rotella v. Wood*, the Supreme Court explored the accrual rules for civil RICO claims. 528 U.S. 549 (2000). It noted that, at one time, the circuit courts had taken "[t]hree distinct approaches" to the accrual question. *Id.* at 553. Some circuits "applied an injury discovery accrual rule[,] starting the clock when a plaintiff knew or should have known of [the] injury." *Id.* "Some applied the injury and pattern discovery rule . . . under which a civil RICO claim accrues only when the claimant discovers, or should discover, both an injury and a pattern of RICO activity." *Id.* And another applied the "last predicate act" rule, under which "the period began to run as soon as the plaintiff knew or should have known of the injury and the pattern of racketeering activity, but began to run anew upon each predicate act forming part of the same pattern." *Id.* at 554. Three years before *Rotella*, the Court had "cut the possibilities by one in rejecting the last predicate act rule." *Id.* (citing *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997)).

Left with two choices, the Court in *Rotella* "eliminate[d]" the injury and pattern discovery rule as "unsound," and instead applied the injury-discovery rule. *Id.* at 554–55. Applying that rule here, plaintiffs' claims are untimely.[1]

Plaintiffs knew of their injuries stemming from the alleged pattern of racketeering sometime around 2011 or 2012. According to the amended complaint, that's when they learned of the jobsite transfer and that FCA and the UAW were not complying with the CBA transfer protocols. The complaint alleges that the transfer "added significant time to [plaintiffs'] daily

---

[1]The Court did leave open the possibility that the proper rule might be an "injury occurrence" rule, under which discovery would be irrelevant. *See Rotella*, 528 U.S. at 554 n.2. But the Court did not rule on that option because the parties had not briefed it. *See id.* Plaintiffs' claims would also be untimely under an injury-occurrence rule.

commutes, approximately an hour each way, in addition to the increased fuel costs and vehicle wear and tear." R. 4, Amended Complaint, PageID 338. Plaintiffs did not receive relocation allowances, despite their belief that they were entitled to them. According to the complaint, plaintiffs learned "[s]oon after the transfer began . . . that the transfer provisions of the [CBA] were being violated." *Id.* Moreover, some employees were allowed to stay at the CTC, avoiding the burdens of the transfer, but not plaintiffs. The alleged harms flowing from the transfer and FCA's "unequal implementation of the transfer" caused plaintiffs to complain to both FCA and the UAW, as early as 2012. *Id.* at 339–40. Under the injury-discovery rule, plaintiffs' RICO claims accrued when they "knew or should have known of [the] injury." *Rotella*, 528 U.S. at 553. Based on the allegations in the amended complaint, plaintiffs knew they had been harmed in 2011 or 2012, and the statute of limitations began to run at that time.

Plaintiffs raise four arguments in response. First, they suggest that *Rotella* did not *reject*, but instead *adopted*, the injury-and-pattern discovery rule. We need not spend long on this claim. Plaintiffs rely on an unpublished decision of this court, which in turn relied on the injury-and-pattern discovery test announced in our pre-*Rotella* caselaw. *See Sims v. Ohio Cas. Ins. Co.*, 151 F. App'x 433, 436 (6th Cir. 2005) (citing *Isaak v. Trumbull Sav. & Loan Co.*, 169 F.3d 390, 399 (6th Cir. 1999)). Unpublished authority is not binding on this court. *See In re Blasingame*, 986 F.3d 633, 637 n.2 (6th Cir. 2021). And *Rotella*, which does bind us, could not have been more explicit in its "eliminat[ion]" of the injury-and-pattern discovery rule. *See* 528 U.S. at 554–58.

Plaintiffs next argue that their claims are saved by the separate-accrual rule. We disagree. In *Klehr*, the Supreme Court noted that "some Circuits have adopted a 'separate accrual' rule in civil RICO cases, under which the commission of a separable, new predicate act within a 4-year limitations period permits a plaintiff to recover for the additional damages caused by that act." 521 U.S. at 190. That rule comes with limitations: "the plaintiff cannot use an independent, new predicate act as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period." *Id.* Instead, the "new act" must have "caused . . . harm over and above the harm that the earlier acts caused." *Id.*

The separate-accrual rule does not help plaintiffs. First, although some circuits have applied this rule to RICO claims, *see, e.g.*, *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1105 (2d Cir. 1988), we never have.**[2]** *See* Appellant Br. at 20 (conceding the point). And the Supreme Court didn't expressly do so in *Klehr* either. *See Klehr*, 521 U.S. at 190. Regardless, the rule does not apply here. Plaintiffs don't point to any new injuries sustained during the limitations period; they point only to the UAW's denials of each of their grievances. In other words, plaintiffs complain that the UAW repeatedly failed to fix the injuries they sustained in the 2011 transfer. Those grievance denials didn't create "harm over and above the harm that the earlier acts caused." *Id.*

Plaintiffs next argue that the statute-of-limitations question should not have been resolved at the Rule 12(b)(6) stage. *See Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012). But "dismissing [a] claim under Rule 12(b)(6) is appropriate" when "the allegations in the complaint affirmatively show that the claim is time-barred." *Id.* That is the case here. The complaint reveals when plaintiffs learned of their injuries (almost a decade before they filed). Plaintiffs counter that fact questions remained regarding when they knew of the *RICO conspiracy*. But as discussed above, the Supreme Court has rejected the injury-and-pattern discovery rule. *Rotella*, 528 U.S. at 554–58. Instead, the Court has made clear that the limitation period begins when plaintiffs' injuries occurred or when they should have known of them. *Id.* at 554 & n.2. Those dates appear on the face of the complaint, so the district court didn't err by resolving the issue on a motion to dismiss.

Finally, plaintiffs say that their claims are subject to equitable tolling. The Supreme Court in *Rotella* suggested that equitable tolling might be available when a RICO pattern involves fraud and thus "remains obscure in the face of a plaintiff's diligence in seeking to identify it." *Id.* at 561. Even so, the Court took care to note "the very nature of such tolling as the exception, not the rule." *Id.* Here, the district court concluded that any equitable-tolling argument failed because plaintiffs did not act with diligence in filing their lawsuit. *See Campbell v. Upjohn Co.*, 676 F.2d 1122, 1128 (6th Cir. 1982); *see also Jay E. Hayden Found. v. First*

---

**[2]**We have applied the separate-accrual rule in the analogous Clayton Act context, however. *See DXS, Inc. v. Siemens Med. Sys., Inc.*, 100 F.3d 462, 467 (6th Cir. 1996).

*Neighbor Bank, N.A.*, 610 F.3d 382, 388 (7th Cir. 2010) ("[I]n a RICO case, the plaintiff must both use due diligence to discover that he has been injured and by whom even if the defendant is engaged in fraudulent concealment, and diligently endeavor to sue within the statutory limitations period or as soon thereafter as feasible."). Plaintiffs learned of their injuries as early as 2011 and learned of the bribery allegations in July 2017 but waited until October 2020 to file their complaint, with no explanation for the delay. Equity favors those who diligently pursue their known rights. *See Continental Can Co. v. Graham*, 220 F.2d 420, 422 (6th Cir. 1955). Plaintiffs didn't do so and haven't shown that the district court abused its discretion by not applying equitable tolling to save their RICO claims. *See Sidney Hillman Health Ctr. of Rochester v. Abbott Lab'ys, Inc.*, 782 F.3d 922, 931 (7th Cir. 2015) (equitable tolling would not "extend the limitations period" in a RICO case where plaintiffs waited more than a year to file suit after learning of defendant's predicate acts); *cf. Zein v. Holder*, 509 F. App'x 505, 509 (6th Cir. 2022) (recognizing that the district court did not abuse its discretion when petitioner waited nine months after the deadline to file a motion to reopen).

For these reasons, the district court didn't err by dismissing plaintiffs' RICO claims as barred by the statute of limitations.

\* \* \*

We AFFIRM.