RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 25a0085p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

THOMAS BALTRUSAITIS; GUILLERMO ANTUNEZ;
PATRICK BARTH; RICHARD BROECKER; RYAN BUDEK;
TUYEN CHU; DARRYL CRAIG; SATISH DOSHI; JOHN
FLETCHER; JON HUTCHINSON; ALAN R.
JARZEMBOWSKI; FRANK KOTSONIS; SANDRA D. LANGE;
ARTHUR LAURIN; KEVIN LUCZAK; TIM MAURO-
VETTER; REGINALD MCINTYRE; CARL OBERNDORFER;
JEROME PEACOCK; EJAZ RAHMAN; CHARLIE RICKMAN;
MARK ROSINSKI; GREG RYNTZ; MICHAEL SAVOSKY;
BRIAN SCHIFFMAN; FRED SCHNELL; MARK SKELLY;
GREGORY SKONIECZNY; LISA SOWINSKI; SURAJ
TANDON; CHANCE TESS; JAMES VIRIGLIO; BRIAN
WARDA; COREY WATKINS; DANNY WOODRUFF;
HAROLD WRIGHT; JOHN ZELL; JAMES ZIEMIANSKI,

> *Plaintiffs-Appellants*,

> No. 24-1356

*v.*

INTERNATIONAL UNION, UNITED AUTOMOBILE,
AEROSPACE AND AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA; FCA US, LLC; ALPHONS
IACOBELLI; JEROME DURDEN; MICHAEL BROWN;
DENNIS WILLIAMS; GARY JONES; NORWOOD H.
JEWELL; VIRDELL KING; KEITH MICKENS, JOHN DOES
1–10,

> *Defendants-Appellees*.

─────────────────

Appeal from the United States District Court for the Eastern District of Michigan at Ann Arbor.
No. 5:23-cv-10861—Judith E. Levy, District Judge.

Argued: December 10, 2024

Decided and Filed: April 4, 2025

Before: MOORE, CLAY, and THAPAR, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Robert L. Levi, ROBERT L. LEVI, PC, Commerce Township, Michigan, for Appellants. Jacob Karabell, BREDHOFF & KAISER, PLLC, Washington, D.C., for Appellee International Union. Brian M. Schwartz, MILLER, CANFIELD, PADDOCK & STONE, PLC, Troy, Michigan, for Appellee FCA. **ON BRIEF:** Robert L. Levi, ROBERT L. LEVI, PC, Commerce Township, Michigan, Kenneth D. Myers, Cleveland, Ohio, for Appellants. Jacob Karabell, Elisabeth Oppenheimer, Grace Rybak, BREDHOFF & KAISER, PLLC, Washington, D.C., for Appellee International Union. Brian M. Schwartz, Thomas W. Cranmer, MILLER, CANFIELD, PADDOCK & STONE, PLC, Troy, Michigan, for Appellee FCA. Michael A. Nedelman, NEDELMAN LEGAL GROUP, PLLC, Farmington Hills, Michigan, for Appellee Alphons Iacobelli.

MOORE, J., delivered the opinion of the court in which CLAY, J., concurred, and THAPAR, J., concurred in the judgment. THAPAR, J., (pp. 22–35), delivered a separate concurring opinion.

---

**OPINION**

---

KAREN NELSON MOORE, Circuit Judge. This case asks us to resolve whether Plaintiffs may bring state-law claims in state court based on a bribery scheme between one of the nation's largest unions and one of the largest auto manufacturers (which resulted in multiple, federal criminal indictments) or whether the claims must be heard in federal court. We hold that such claims must be heard in federal court because Congress has completely preempted any claims based on the rights created by the collective bargaining agreement.

Plaintiffs are thirty-eight current and former engineers employed by Defendant FCA US LLC ("FCA"), the successor corporation to Chrysler Group, LLC. Plaintiffs are and were members of International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"), the union representing engineering employees of FCA. Once the massive bribery scheme was made public, Plaintiffs pursued workplace grievances alleging that FCA officials had paid bribes to UAW officials to transfer Plaintiffs' workplaces in violation of the collective bargaining agreement. These grievances were denied, and a previous panel of this court held that federal claims based on these grievances were time-barred. While Plaintiffs

pursued their federal claims in federal court, they also filed a complaint in state court asserting state common-law claims. Following removal of the state-court action to federal court, the district court denied Plaintiffs' motion for remand, and the parties stipulated to dismissal.

For the reasons explained below, we **AFFIRM** the district court's judgment and order denying Plaintiffs' motion for remand.

## I. BACKGROUND

### A. Factual Background

Plaintiffs' claims originate in their 2011 workplace transfers. On September 26, 2011, then-FCA Vice President Alphons Iacobelli wrote a letter to UAW officials explaining that FCA was transferring Plaintiffs from the Chrysler Technical Center ("CTC") in Auburn Hills, Michigan, to the Trenton Engine Complex ("TEC") in Trenton, Michigan. R. 1 (Compl. ¶ 13) (Page ID #16). The move was made pursuant to Section 57 of the 2007 UAW–Chrysler Engineering Office and Clerical Agreement ("the 2007 National Agreement"), governing under what circumstances and procedures FCA may transfer units. *Id.* The transfers added roughly an hour each way to Plaintiffs' daily commutes to work, which "increased their fuel costs and wear and tear on their vehicles." *Id.* ¶ 17 (Page ID #17).

Between 2012 and 2015, Plaintiffs noted some discrepancies in the implementation of their transfers. *Id.* ¶¶ 19–28 (Page ID #18–21). For instance, Plaintiffs noted that some employees were given preferential treatment to remain in the CTC despite the transfer order, and that non-bargaining-unit employees working at lower salaries were performing work that was previously assigned to higher-paid unionized employees. *Id.* In light of these discrepancies, Plaintiffs filed a grievance with the UAW in 2015. *Id.* ¶ 29 (Page ID #21). This grievance was never pursued by the union and, on Plaintiffs' information and belief, may remain pending. *Id.*

Unbeknownst to Plaintiffs, during this same period, the FCA Defendants and the UAW Defendants were engaged in an illicit bribery scheme. *See id.* ¶ 32 (Page ID #22). "On January 22, 2018, Iacobelli pleaded guilty to paying $1.5 million in bribes to several UAW officials in exchange" for FCA-friendly positions from the UAW in collective-bargaining negotiations and

the resolution of grievances. *Id.* ¶ 58 (Page ID #30). According to Plaintiffs, the goal of this bribery scheme was to damage General Motors financially and force a merger with FCA. *Id.* ¶ 25 (Page ID #20).

This bribery scheme intersected with Plaintiffs' transfers and subsequent grievances in two important respects. First, FCA instituted Plaintiffs' transfers allegedly for the purpose of "caus[ing] the attrition of bargaining unit engineers so that the FCA Defendants could replace them with [non-bargaining-unit] engineers . . . ." *Id.* ¶ 22 (Page ID #19). Second, "FCA and its officials made illegal payments to UAW officials . . . to obtain benefits, concessions and advantages for FCA in its relationship with the UAW through negotiating company-friendly contracts, acting in the company's interests on grievances, and the UAW agreeing to concessions through side agreements and memoranda of understanding that were not even part of the collective bargaining process or the grievance process, without regard for the actual merits of grievances or other disputes by Plaintiffs and other union-members." *Id.* ¶ 51 (Page ID #28).

Plaintiffs first learned of the bribery scheme on July 26, 2017, when the federal indictment of Iacobelli was made public. *Id.* ¶ 32 (Page ID #22). Following this revelation, on August 2, 2017, Plaintiffs filed grievance 17-25-001, wherein they alleged that their transfers were the result of collusion between FCA and the UAW. *Id.* ¶¶ 30–32 (Page ID #21–22). FCA responded to grievance 17-25-001 by asserting that the grievance was untimely and lacked merit under the terms of the 2007 National Agreement. *Id.* ¶ 35 (Page ID #24). On November 3, 2017, Plaintiffs were notified that a UAW official withdrew the grievance. *Id.* ¶ 36 (Page ID #25). Plaintiffs appealed the UAW official's decision, and this appeal was ruled untimely. *Id.* ¶ 37 (Page ID #25). Plaintiffs did not appeal this last ruling. *Id.*

Plaintiffs filed grievance 18-25-001 on February 2, 2018, seeking essentially the same relief as 17-25-001, but with additional details of the bribery scheme as described in Iacobelli's January 22, 2018, guilty plea. *Id.* ¶¶ 38–39, 42, 58 (Page ID #25–26, 30). FCA responded that this new grievance was meritless. *Id.* ¶ 40 (Page ID #25). On August 27, 2018, Plaintiffs were notified that a UAW official had withdrawn their grievance, and Plaintiffs appealed this decision. *Id.* ¶¶ 41–42 (Page ID #26). After Plaintiffs' appeal was denied on February 7, 2019, Plaintiffs further appealed to the UAW's Public Review Board ("PRB"), "the last step in UAW's internal

appeal process," on February 24, 2019. *Id.* ¶¶ 43–44 (Page ID #26). On January 22, 2020, the PRB ruled that Plaintiffs had made a sufficient showing to warrant investigation whether fraud impacted their 2011 transfers. *Id.* ¶ 46 (Page ID #26). The PRB issued a final ruling on May 6, 2020 "that the UAW's response to the PRB's request for additional information 'fail[ed] to provide sufficient information to rebut Appellants' threshold showing in this matter,'" and that Plaintiffs had exhausted their internal remedies and could pursue litigation. *Id.* ¶ 47 (Page ID #26–27).

## B.  Procedural Background

Prior to initiating this action in state court on March 30, 2023, R. 1 (Compl. at 1) (Page ID #12), Plaintiffs filed suit in federal court on October 16, 2020, against FCA, the UAW, and various officials, bringing two RICO claims, federal and state civil-conspiracy, fraud, and two "hybrid" Labor Management Relations Act ("LMRA") claims. *See Baltrusaitis v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. ("Baltrusaitis I")*, 86 F.4th 1168, 1174 (6th Cir. 2023). The district court in *Baltrusaitis I* granted those defendants' motions to dismiss on statute-of-limitations grounds and declined to exercise pendent jurisdiction over the remaining state-law claims. *See id.* Another panel of this court affirmed this decision on appeal. *Id.* at 1172.

While the appeal in *Baltrusaitis I* was pending, Plaintiffs filed three state-law claims against Defendants in Michigan state court. R. 1 (Compl. ¶ 1) (Page ID #13). In Count I, Plaintiffs bring two fraud claims against the UAW Defendants for "silent fraud and positive fraud." *Id.* ¶¶ 130–54 (Page ID #51–56). Count I is premised on the theory that the UAW Defendants were silent and made positive representations that they were acting in Plaintiffs' best interests in the transfer and grievance processes, despite the fact that the UAW Defendants had accepted bribes from the FCA Defendants in return for transferring Plaintiffs and then ignoring their grievances. *Id.* In Count II, Plaintiffs bring a breach-of-fiduciary-duty claim against the UAW Defendants based on Michigan common law. *Id.* ¶¶ 155–72 (Page ID #56–59). Similar to Count I, Count II's theory of liability is premised on the idea that the UAW Defendants completely abandoned their fiduciary duties to Plaintiffs by engaging in a bribery scheme with the FCA Defendants. *Id.* In Count III, Plaintiffs bring a civil-conspiracy claim derivative of

their fraud and breach-of-fiduciary-duty claims against all Defendants (i.e., both the FCA Defendants and the UAW Defendants). *Id.* ¶¶ 173–76 (Page ID #59–60).

On April 14, 2023, the UAW removed the state-court action to the federal district court for the Eastern District of Michigan based on complete preemption under § 301 of the LMRA. R. 1 (Notice of Removal ¶ 6) (Page ID #4); *see also* 29 U.S.C. § 185. Then, on July 17, 2023, Plaintiffs filed a motion for remand to the Michigan state court. R. 40 (Mot. for Remand at 1) (Page ID #588). Following briefing, the district court denied Plaintiffs' motion for remand. *Baltrusaitis v. UAW ("Baltrusaitis II")*, 695 F. Supp. 3d 909, 912 (E.D. Mich. 2023). The parties then stipulated to dismissal of Plaintiffs' complaint. *Baltrusaitis v. UAW ("Baltrusaitis III")*, No. 23-cv-10861, 2024 WL 781396, at *1 (E.D. Mich. Feb. 26, 2024). Plaintiffs expressly reserved the right to appeal the district court's order denying their motion for remand. *Id.*

## C. District Court's Decision

On September 27, 2023, the district court denied Plaintiffs' motion for remand. *Baltrusaitis II*, 695 F. Supp. 3d at 912. The district court found that Plaintiffs' claims were completely preempted by § 301 of the LMRA. *Id.* at 915–18. Applying the two-part § 301 preemption test described in *DeCoe v. General Motors Corp.*, 32 F.3d 212 (6th Cir. 1994), the district court found that Plaintiffs' claims were preempted because, each "state law claim require[d] interpretation of collective bargaining agreement terms." *Baltrusaitis II*, 695 F. Supp. 3d at 915–19 (quoting *DeCoe*, 32 F.3d at 216).

With respect to Count I, the fraud claims, the district court found that "[a]t the heart of plaintiffs' claim is the assertion that UAW defendants inappropriately withdrew or dismissed their grievances," and that this "claim is not cognizable without plaintiffs' underlying assumption that the grievances had merit." *Id.* at 916. The district court could not "resolve this issue without interpreting the terms of the collective bargaining agreement," and therefore it found that Count I "is preempted and properly removed." *Id.* at 916–17. Count II was resolved in much the same manner: "the heart of this [fiduciary-duty] claim rests upon the assertion that the grievances were meritorious and that the transfer violated the collective bargaining agreement." *Id.* at 917. In other words, there could be no breach of a fiduciary duty to advocate

on Plaintiffs' behalf absent finding that Plaintiffs' grievances were meritorious and worthy of advocating. *Id.* Regarding Count III, the district court found that, because Plaintiffs' civil-conspiracy claim was derivative of Plaintiffs' fraud and breach-of-fiduciary-duty claims, this claim also must be preempted under § 301. *Id.* at 918. Finally, the district court rejected Plaintiffs' remaining miscellaneous arguments for remand. *Id.* at 918–19.

## II. DISCUSSION

We review de novo the district court's denial of Plaintiffs' motion for remand. *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 465 (6th Cir. 2002).

Section 301 of the LMRA provides that "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . may be brought in any district court of the United States having jurisdiction of the parties . . . ." 29 U.S.C. § 185(a). This section also "encompasses 'suits by and against individual employees as well as between unions and employers.'" *Swanigan v. FCA US LLC*, 938 F.3d 779, 784 (6th Cir. 2019) (quoting *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 562 (1976)). With § 301, "Congress intended doctrines of federal labor law uniformly to prevail over inconsistent local rules." *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 209–10 (1985) (quoting *Loc. 104, Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 104 (1962)). In other words, § 301 completely preempts state-law claims. *See id.* "Once an area of state law has been completely pre-empted, any claim purportedly based on that pre-empted state law is considered, from its inception, a federal claim, and therefore arises under federal law." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 393 (1987). The preemptive force of § 301 is "unusually 'powerful,'" by "authorizing removal of actions that sought relief only under state law." *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 6–7 (2003) (quoting *Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 23 (1983)). Plaintiffs, by suing the UAW and FCA in state court based on conduct allegedly in violation of their collective bargaining agreement, have triggered the possibility that their state-law claims are completely preempted under § 301.

The preemptive force of § 301 is far reaching, "extend[ing] beyond suits alleging contract violations." *Allis-Chalmers Corp.*, 471 U.S. at 210. "Any other result would elevate form over

substance and allow parties to evade the requirements of § 301 by relabeling their contract claims" as standard state-law tort claims. *Id.* at 211. "In *DeCoe*, we laid out the two-step test for determining whether a tort claim is sufficiently intertwined with the meaning of a collective bargaining agreement to make it subject to federal preemption: the court must first 'examine whether proof of the state law claim requires interpretation of collective bargaining agreement terms.'" *Adamo Demolition Co. v. Int'l Union of Operating Eng'rs Loc. 150*, 3 F.4th 866, 873 (6th Cir. 2021) (quoting *DeCoe*, 32 F.3d at 216). "If the claim does not require interpreting the collective bargaining agreement terms, the court must then assess 'whether the right claimed by the plaintiff is created by the collective bargaining agreement or by state law.'" *Adamo*, 3 F.4th at 873 (quoting *DeCoe*, 32 F.3d at 216). "In short, if a state-law claim fails *either* of these two requirements, it is preempted by § 301." *Mattis v. Massman*, 355 F.3d 902, 906 (6th Cir. 2004). If Plaintiffs' claims require interpretation of the terms of the collective bargaining agreement or if the rights claimed by Plaintiffs are created by the collective bargaining agreement, then their claims are completely preempted, and we must affirm the district court.

We hold that Plaintiffs' claims are completely preempted under *DeCoe* both step one and step two. Plaintiffs' allegations stem entirely from rights flowing out of the CBA. At the heart of Plaintiffs' claims is the theory that they were injured by virtue of their workplace transfers and subsequent resolution of internal workplace grievances as governed by the CBA. Their rights surrounding their transfers exist solely by virtue of the CBA. Plaintiffs can claim that their transfers were wrongful only because the CBA defines under what circumstances FCA may transfer employees. Plaintiffs' claims thus entirely rely on Plaintiffs' rights as unionized employees. These are exactly the types of labor disputes for which Congress intended to ensure uniform enforcement through complete preemption.

## A.  Michigan Common-Law Fraud

Plaintiffs bring two theories of state-law fraud: silent fraud and fraudulent misrepresentation. Both claims are completely preempted under *DeCoe* steps one and two. *See Titan Ins. Co. v. Hyten*, 817 N.W.2d 562, 567 (Mich. 2012) (recognizing three doctrines of fraud "includ[ing] actionable fraud, also known as fraudulent misrepresentation; innocent misrepresentation; and silent fraud, also known as fraudulent concealment").

**1.** *DeCoe* **Step One**

Plaintiffs' fraud claims are completely preempted under *DeCoe* step one. Plaintiffs cannot prove a material misrepresentation or silent fraud without interpreting the terms of the CBA governing grievances and transfers. Plaintiffs' economic theory of harm flounders for similar reasons. Plaintiffs' right to avoid the transfers exists solely because of the CBA, and thus proving economic harm stemming from any alleged fraud requires proving that Plaintiffs were wrongfully transferred under the terms of the CBA. If Defendants could transfer Plaintiffs under the terms of the CBA, then Plaintiffs have no basis on which to argue that they were otherwise harmed by their transfers.

There are six elements to a claim of fraudulent misrepresentation (or positive fraud): "(1) That defendant made a material representation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury." *Titan Ins.*, 817 N.W.2d at 567–68 (quoting *Candler v. Heigho*, 175 N.W. 141, 143 (Mich. 1919)).

For a claim of silent fraud, Plaintiffs also must plead that the UAW Defendants had "a legal duty to make a disclosure" of a material fact and that the UAW Defendants failed to disclose that fact. *Hord v. Env't Rsch. Inst. of Mich.*, 617 N.W.2d 543, 550 (Mich. 2000). "A fraud arising from the suppression of the truth is as prejudicial as that which springs from the assertion of a falsehood, and [Michigan] courts have not hesitated to sustain recoveries where the truth has been suppressed with the intent to defraud." *M&D, Inc. v. W.B. McConkey*, 585 N.W.2d 33, 37 (Mich. Ct. App. 1998) (quoting *Lorenzo v. Noel*, 522 N.W.2d 724, 725 (Mich. Ct. App. 1994)). "Thus, the suppression of a material fact, which a party in good faith is duty-bound to disclose, is equivalent to a false representation and will support an action in fraud." *Id.* (quoting *Lorenzo*, 522 N.W.2d at 725).

Both of Plaintiffs' fraud claims require interpreting the terms of the CBA and thus are completely preempted under *DeCoe* step one. Plaintiffs' fraud claims are based on the theory that the UAW Defendants failed to disclose that they were taking bribes, that the union officials

made positive representations that they represented Plaintiffs' interests, and that, as a result, Plaintiffs suffered injuries from their wrongful transfers and unprocessed grievances. As demonstrated below, proof of Plaintiffs' fraud claims plainly requires interpreting the terms of the CBA.

For instance, in support of their silent fraud theory, Plaintiffs allege that "while [their] grievances were being processed . . . the UAW Defendants had accepted, and were accepting, bribes which led to their negative processing of the Plaintiffs' grievances, including the dismissal and withdrawal of those grievances." R. 1 (Compl. ¶ 136) (Page ID #52). At its core, Plaintiffs' theory is that "[t]he UAW Defendants knew that the Plaintiffs were relying upon the UAW Defendants' loyalty to address their complaints and prosecute their grievances, and yet, the UAW Defendants did not reveal material facts within those Defendants' knowledge, i.e., that they were accepting bribes to forego responsible representation . . . ." *Id.* ¶ 137 (Page ID #52). Thus, "[t]he intentional failure of the UAW Defendants to apprise the Plaintiffs of the ongoing bribery scheme caused economic loss and mental suffering to the Plaintiffs." *Id.* ¶ 139 (Page ID #53).

Proving the contention that Defendants failed to apprise Plaintiffs about the ongoing bribery scheme requires interpreting two sets of terms under the CBA. First, to prove that they were harmed by misprocessed grievances, Plaintiffs must first prove that their grievances were in fact misprocessed. *See id.* ¶¶ 136–39 (Page ID #52–53). The CBA governs the procedures for processing grievances. *See* R. 46-1 (2007 National Agreement at 22–32) (Page ID #695–705). To demonstrate that the UAW Defendants did not "prosecute their grievances," Plaintiffs must point to and interpret the terms of the CBA governing the processing of grievances. *Id.* Doing so is necessary to show at which steps in the process the UAW Defendants abdicated their duties. R. 1 (Compl. ¶ 139) (Page ID #53). Second, to prove that the misprocessed grievances harmed Plaintiffs, Plaintiffs must demonstrate that their underlying grievances were meritorious. Plaintiffs' theory of harm is that, under Section 57 of the CBA, their transfers were wrongful. *See id.* ¶ 131 (Page ID #51) ("That duty included the duty to apprise the Plaintiffs . . . for the protection of their own interests in the grievances they filed opposing their transfer to Trenton Engine Complex . . . ."). If their transfers were not made in violation of the CBA, then Plaintiffs

were not harmed. Otherwise, Defendants were free to transfer Plaintiffs' workplaces, and Plaintiffs had no choice but to accept the increased cost of travel for work. Their right to not be transferred existed solely because of the CBA. *See id.* ¶ 15 (Page ID #17); *see also* R. 46-1 (2007 National Agreement at 59–61) (Page ID #732–34) (Section 57 provisions governing transfers). If the CBA did not contain provisions governing transfers, then Plaintiffs would have no silent fraud claim. Without referencing and interpreting the terms of the CBA, Plaintiffs could prove neither suppression of a material fact nor harm from a transfer in violation of the terms of the CBA.

Plaintiffs' positive fraud theory is preempted under *DeCoe* step one for the same reasons. The complaint alleges that "[i]f the UAW Defendants had apprised the Plaintiffs" of the bribery scheme, then "the Plaintiffs would have reported the bribery scheme . . . and obtained the representation of honest union officials for the prosecution of their grievances." R. 1 (Compl. ¶ 146) (Page ID #54). Implicit in Plaintiffs' allegations is the assumption that Plaintiffs' grievances were meritorious and that "honest union officials" would have reversed their transfers. *Id.* ¶¶ 136, 146 (Page ID #52, 54). If Plaintiffs' grievances were not meritorious (and their transfers not wrongful), then the existence of the bribery scheme made no difference to Plaintiffs' complaints. Plaintiffs assume that only the bribery scheme stood in the way of succeeding in their grievances. Thus, evaluating the merits of Plaintiffs' fraud claims would require interpreting the terms of the CBA governing transfers and grievance procedures.

That Plaintiffs' fraud claims are based on a court finding that their grievances were meritorious is reflected elsewhere in Plaintiffs' complaint. Plaintiffs allege that their transfers violated "Section 57 of the 2007 National Agreement." R. 1 (Compl. ¶ 15) (Page ID #17). Specifically, they assert that FCA failed to "provide notice and confer with the union" in violation of Section 57(b), *id.*, and that Plaintiffs were selected for transfer in violation of Section 57(c), *id.* ¶ 16 (Page ID #17). Plaintiffs allege that Defendants accepted bribes from the FCA Defendants in exchange for "withdrawing, ignoring, or giving short shrift to Plaintiffs' grievances and complaints about the transfers . . . ." *Id.* ¶ 73 (Page ID #35); *see also id.* ¶¶ 34–35, 71, 77–78, 81, 85, 90–99, 106–07, 114 (Page ID #24, 34, 36–38, 40–44, 46). In short, Plaintiffs' claims require that a court find that "both the FCA Defendants and the UAW

Defendants knew that the Plaintiffs had been wrongfully transferred and pushed out of their positions as a result of the bribes to the UAW Defendants . . . ." *Id.* ¶ 107 (Page ID #44). For a court to determine whether Plaintiffs' transfers were wrongful, it would need to look at the provisions of Section 57 of the 2007 National Agreement and evaluate the merits of Plaintiffs' allegations. *See id.* ¶¶ 15–16 (Page ID #17). If Plaintiffs were not wrongfully transferred under the terms of the 2007 National Agreement, then their grievances were not wrongfully dismissed or withdrawn. If their grievances were not wrongfully dismissed or withdrawn, then the UAW Defendants made no material misrepresentations nor stayed silent on any material fact.

### 2. *DeCoe* Step Two

Plaintiffs' fraud claims are also completely preempted under the second step of *DeCoe* because Plaintiffs' rights and interests in their transfers are created by the CBA. Plaintiffs' arguments against preemption are resolved neatly by *Fox v. Parker Hannifin Corp.*, 914 F.2d 795 (6th Cir. 1990), and *Terwilliger v. Greyhound Lines, Inc.*, 882 F.2d 1033 (6th Cir. 1989). These cases hold that a state-law claim asserting the misprocessing of grievances based on rights created by the CBA (like Plaintiffs' transfer rights) are completely preempted under § 301. Plaintiffs' fraud claims are merely § 301 breach-of-the-CBA claims masquerading as state-law fraud claims. These types of nebulous fraud claims require preemption under *DeCoe* step two, *Fox*, and *Terwilliger* because "the CBA in this case affords the single mechanism for pursuing, reviewing, and resolving the grievances at the heart of the plaintiff's fraud claim." *Fox*, 914 F.2d at 802.

Plaintiffs' own complaint demonstrates why their claims are completely preempted under *DeCoe* step two, *Fox*, and *Terwilliger*. As part of their fraud allegations, Plaintiffs claim that the UAW Defendants violated the following duties: (1) "a fiduciary duty of loyalty to the Plaintiffs"; (2) a "duty of disclosure of facts material to the processing of union members' grievances"; (3) "the duty to apprise the Plaintiffs of facts important for the Plaintiffs to know for the protection of their own interests in the grievances they filed opposing their transfer"; and (4) "the duty to apprise the Plaintiffs that the UAW Defendants were accepting bribes from FCA to take company-friendly positions with regard to negotiations and grievances with FCA." R. 1 (Compl. ¶ 131) (Page ID #51). These duties exist by virtue of the CBA. At bottom, Plaintiffs'

fraud claims assert that the Defendants violated the CBA by wrongfully transferring Plaintiffs (in violation of the CBA) and then mishandling Plaintiffs' subsequent grievances (also in violation of the CBA). In this context, *Fox* and *Terwilliger* frame our *DeCoe* step two resolution well: "As in *Terwilliger*, where the CBA 'create[d] the right . . . claimed by [the plaintiff] and provide[d] the only basis for the relationship between [the plaintiff] and [his employer],' the CBA in this case affords the single mechanism for pursuing, reviewing, and resolving the grievances at the heart of the plaintiff's fraud claim." *Fox*, 914 F.2d at 802 (second and fourth alterations added) (quoting *Terwilliger*, 882 F.2d at 1038). This type of fraud claim is completely preempted under § 301 because "the plaintiff has merely alleged that the Company and the Union engaged in fraudulent malfeasance of CBA obligations." *Id.*

In *Fox*, among other claims, the plaintiffs brought a state-common-law-fraud claim against Parker Hannifin Corp. after the company terminated one of the plaintiffs for "interfering with employees." 914 F.2d at 798. We held that the plaintiffs' fraud claim was completely preempted under § 301 because the fraud claim was predicated "solely upon the manner in which the Company and the Union carried out the CBA-defined process of reviewing her various grievances," and that the claim "clearly [fell] within the ambit of section 301 preemption in the same manner as the plaintiff's fraud claim in *Terwilliger v. Greyhound Lines, Inc.*" *Id.* at 802 (citing *Terwilliger*, 882 F.2d at 1037–38). In *Terwilliger*, we held that where "[t]he [CBA] creates the right . . . and provides the only basis for the relationship between" the plaintiff and defendant, then § 301 completely preempts the state-law claims. 882 F.2d at 1038. Thus, under *Fox* and its gloss on *Terwilliger*, when the CBA creates the rights at issue and the plaintiffs' sole other complaint is that their grievances were mishandled by the union, then their claims are completely preempted under § 301.

This case is on all fours with *Fox* and its gloss on *Terwilliger*. In this case, the CBA created the rights at issue: (1) "a fiduciary duty of loyalty to the Plaintiffs"; (2) a "duty of disclosure of facts material to the processing of union members' grievances"; (3) "the duty to apprise the Plaintiffs of facts important for the Plaintiffs to know for the protection of their own interests in the grievances they filed opposing their transfer"; and (4) "the duty to apprise the Plaintiffs that the UAW Defendants were accepting bribes from FCA to take company-friendly

positions with regard to negotiations and grievances with FCA." R. 1 (Compl. ¶ 131) (Page ID #51). These duties are created by the CBA. For example, Section 57 of the CBA governs transfers and Sections 18 through 32 govern grievance processing. R. 46-1 (2007 National Agreement at 22–32, 59–61) (Page ID #695–705, 732–34). Plaintiffs' fraud claims could not exist without the CBA. If the CBA did not govern seniority in transfers, then Plaintiffs could not have been transferred wrongfully, and so the UAW Defendants would not have to lie about bribes to cover any wrongdoing by the FCA Defendants. If Plaintiffs could not have been transferred wrongfully, then the UAW Defendants did not lie when they rejected Plaintiffs' grievances nor when they failed to inform Plaintiffs about the bribery scheme. Plaintiffs' theory of the case would make little sense if the UAW Defendants were right to deny Plaintiffs' grievances and the FCA Defendants were allowed to effectuate the transfers. In other words, the wrongful acts at the heart of Plaintiffs' fraud claims—the allegedly wrongful transfers and wrongfully dismissed grievances—are creatures of the CBA. Plaintiffs' claims are, in essence, breach-of-the-CBA claims.

Plaintiffs assert that the UAW Defendants breached specific provisions of the CBA and lied to Plaintiffs about breaching those claims. Plaintiffs' claims are intelligible only because of the rights, duties, and procedures created by the CBA. Even accepting Plaintiffs' point that bribery is obviously wrongful and not covered by the terms of the CBA, the heart of Plaintiffs' complaint is that the CBA rules governing transfers were violated and that the UAW Defendants swept this violation under the rug by wrongfully processing or failing to process grievances. Simply put, the CBA defines the entirety of Plaintiffs' complaint.

Plaintiffs' attempt to distinguish *Fox* is unpersuasive. Reply at 10–14. Plaintiffs are correct that, under *Fox*, a tort claim that is independent of the CBA is not subject to preemption under § 301, even if the tort occurred during the scope of employment. *Id.* at 11 (citing *Fox*, 914 F.2d at 801–02). Relying on this holding, Plaintiffs posit that their fraud claims are independent of the CBA because the bribery scheme between FCA and the UAW occurred outside the scope of the CBA. Reply at 12. Yet, the injuries alleged by Plaintiffs all stem from their allegedly wrongful transfers. R. 1 (Compl. ¶¶ 15–16) (Page ID #17). Plaintiffs' rights to transfer (or lack thereof) and to an honest grievance process all arise from the CBA. This is unlike the plaintiffs

in *Fox*, who could pursue a state-law claim for intentional infliction of emotional distress because the issue of "whether the defendants harassed the plaintiffs 'so outrageously as to cause [them] emotional distress' is an issue that can be decided without interpreting the CBA." 914 F.2d at 802 (quoting *Knafel v. Pepsi-Cola Bottlers of Akron, Inc.*, 899 F.2d 1473, 1483 (6th Cir. 1990)).

The problem for Plaintiffs is that we can evaluate Plaintiffs' fraud claims only within the context of the CBA.[1] The right to a particular transfer process was created by the CBA. The right to an honest grievance procedure was also created by the CBA. That Plaintiffs could conceivably prove their claims without interpreting any particular term in the CBA does not mean that their claims are independent of the CBA. Repeated references in the complaint to the CBA demonstrate that Plaintiffs' claims are inextricably intertwined with the CBA. Here are some key assertions in the complaint showing that Plaintiffs' theory of the case exists by virtue of the rights and duties imposed by the CBA:

- "Iacobelli's letter said that, *in accordance with Section 57 of the 2007 UAW-Chrysler Engineering Office and Clerical Agreement* (the National Agreement), FCA intended to transfer the work performed by the AMEPT division . . . ." R. 1 (Compl. ¶ 13) (Page ID #16) (emphasis added).

- "Soon after the transfer began, Plaintiffs became aware that the transfer provisions of the collective bargaining agreement were being violated . . . ." *Id.* ¶ 18 (Page ID #18).

- "Several grievances regarding the transfer of work to the Advanced Planning Group were submitted to the *National Negotiating Team*, but there was neither disposition of the grievances *nor any resolution of them in the new collective bargaining agreement*." *Id.* ¶ 28 (Page ID #21) (emphasis added).

- "In 2015, Plaintiffs filed grievance 15-25-001 regarding the 2011 transfer of operations. That grievance sought payment of $30,000 for each

---

[1]For substantially the same reasons, Plaintiffs' reliance on *Continental Management, Inc. v. United States*, is unpersuasive. *See* Appellant Br. at 28 (citing *Cont'l Mgmt., Inc. v. United States*, 527 F.2d 613 (Ct. Cl. 1975)). In *Continental Management*, the Court of Claims held that the United States could pursue a common-law tort action for recovery of bribery damages and secure as damages the amount of the bribes actually paid. 527 F.2d at 617–18. This case does not help us resolve whether Plaintiffs' claims are completely preempted under *DeCoe* step two. That the United States could pursue a tort action to recover bribery damages from mortgage bankers does little to clarify whether Plaintiffs' rights in this case are created by the CBA. *See id.* at 620 ("[C]ommon law rights and remedies survive, *unless* Congress intended the legislative provision to be exclusive." (emphasis added)).

affected employee under the *National Agreement's Relocation Allowance Plan*." *Id.* ¶ 29 (Page ID #21) (emphasis added).

- "On August 2, 2017, Plaintiffs filed grievance 17-25-001, on behalf of all employees in the transferred group. The grievance claimed a *violation of the 'Purpose and Intent' of the National Agreement*." *Id.* ¶ 30 (Page ID #21) (emphasis added).

- "In reality, Jewell *was accepting bribes to do FCA's bidding in regards to grievance handling and contract negotiations*, rather than doing the bidding of Plaintiffs and other UAW members." *Id.* ¶ 78 (Page ID #37) (emphasis added).

- "*The entire collective bargaining process was compromised by the fraudulent giving and receiving of bribes*, by concealing those bribes from Plaintiffs, and by misrepresenting to Plaintiffs that the union was diligently pursuing the Plaintiffs' grievances." *Id.* ¶ 91 (Page ID #40) (emphasis added).

- "The *bribes exchanged* between the other Defendants likewise *corrupted the bargaining and grievance processes*." *Id.* ¶ 93 (Page ID #40) (emphasis added).

Accordingly, we affirm the district court's determination that Plaintiffs' fraud claims are completely preempted by § 301.

We take a moment here to address the concurrence. Plaintiffs' claims are exactly the type of "nebulous fraud claim" that *Fox* and *Terwilliger* held must be preempted. *Fox*, 914 F.2d at 801. Construing Plaintiffs' complaint as anything other than wholly based on the CBA requires ignoring Plaintiffs' repeated reliance on the CBA. By our count, around 112 of Plaintiffs' numbered allegations directly reference either: (1) Plaintiffs' grievances; (2) the collective-bargaining process; or (3) the CBA itself and the duties imposed by the CBA. This accounts for roughly 63.6% of Plaintiffs' total allegations (to say nothing of the amount of text actually devoted to the subject matter).

Even Plaintiffs' economic theory of harm relies, in part, on the terms of the CBA. *See, e.g.*, R. 1 (Compl. ¶ 19) (Page ID #18) ("As early as 2012, Plaintiffs complained to FCA's Human Resources Department about the uneven treatment of employees within the transferred unit and that the transferred employees *should have received a relocation allowance*." (emphasis added)); *id.* ¶ 20 (Page ID #19) ("Plaintiffs were also unhappy with the use of pool cars located

at the CTC. The transferred employees preferred to use pool cars located at the CTC for weekend overtime assignments at nearby plants. . . . In 2013, the union raised the issue of the location and access to pool cars, but no resolution was reached."). To state that Plaintiffs' fraud claims assert a universal right to be free from fraud—as opposed to specific rights to transfers under Section 57 of the CBA governing transfers and Sections 18 through 32 governing the processing of grievances—requires ignoring Plaintiffs' complaint and allegations.

The concurrence's reference to *Odell v. Kalitta Air, LLC*, does not persuade us otherwise because that case's holding and rationale are not applicable to this case. 107 F.4th 523 (6th Cir. 2024). In *Odell*, the plaintiffs indisputably asserted rights independently created by federal law. There, the plaintiffs sought religious and medical exemptions to their employer's vaccine mandate. *Id.* at 527. As we recognized, "[t]he Pilot Plaintiffs' claims under Title VII and the ADA are created by federal law, rather than the CBA." *Id.* at 531. Indeed, the *Odell* plaintiffs did not reference the CBA in their complaint, they did not base their claims on the terms of the CBA, and the plaintiffs' union officials expressly "stated that the proper avenue for those with an exemption to protest an accommodation (or lack thereof) was 'through an EEOC complaint,' rather than through the CBA's grievance system." *Id.* at 527 (citation omitted). Therefore, *Odell* was properly a step-one case because the plaintiffs sought to assert rights that were not granted to them by the CBA but that existed by virtue of independent federal laws applicable to all workers—union and non-unionized. The same is not true with regard to Plaintiffs' fraud claims here. Plaintiffs' fraud claims would not exist but for the CBA. It is precisely for this reason that Plaintiffs repeatedly reference the CBA throughout the body of their complaint and in asserting their specific fraud claims. The fraud claims here are based on Plaintiffs' transfer rights and allegedly mishandled grievances. Plainly, this is the sort of nebulous tort claim based on union rights and grievances that we have held must be preempted under *Fox* and *Terwilliger*. *Odell*, as a *DeCoe* step-one case, does not address how we must handle the sort of nebulous tort claims that Plaintiffs here have alleged.

Accordingly, we hold that Plaintiffs' fraud claims are preempted under *DeCoe* step two as well as under step one.

**B. Claim of Breach of Fiduciary Duty**

For substantially the same reasons as pertain to Plaintiffs' fraud claims, Plaintiffs' breach-of-fiduciary-duty claim is completely preempted under *DeCoe* step one and step two.

Plaintiffs' claim for breach of fiduciary duty has three elements under Michigan law. "To establish a claim for breach of fiduciary duty, a plaintiff must prove (1) the existence of a fiduciary duty, (2) a breach of that duty, and (3) damages caused by the breach of duty." *Highfield Beach at Lake Mich. v. Sanderson*, 954 N.W.2d 231, 247 (Mich. Ct. App. 2020). Michigan courts have "explained that a fiduciary relationship arises from the reposing of faith, confidence, and trust and the reliance of one on the judgment and advice of another." *Teadt v. St. John's Evangelical Lutheran Church*, 603 N.W.2d 816, 823 (Mich. Ct. App. 1999). "Relief is granted when such position of influence has been acquired and abused, or when confidence has been reposed and betrayed." *Id.* "A person in a fiduciary relation to another is under a duty to act for the benefit of the other with regard to matters within the scope of the relation." *Id.*

Plaintiffs' claim of breach of fiduciary duty can be resolved in much the same way as Plaintiffs' fraud claims under both *DeCoe* steps. Ultimately, Plaintiffs' claim of breach of fiduciary duty is completely preempted under step one and step two because the claim hinges almost entirely on the terms of the CBA, the rights created by the CBA, and the relationships between the parties by virtue of the CBA. *See Fox*, 914 F.2d at 801–02; *see also Terwilliger*, 882 F.2d at 1038; *Williams v. Nat'l Football League*, 582 F.3d 863, 881 (8th Cir. 2009) (holding that a state-law claim of breach of fiduciary duty is completely preempted by § 301 when the fiduciary's duties must be resolved by reference to the CBA).

Accordingly, we affirm the district court's decision that Count II is completely preempted.

**C. Conspiracy Claim**

We also affirm the district court's decision regarding Plaintiffs' conspiracy claim because this claim is derivative of their other state-law claims. *See* R. 1 (Compl. ¶ 175) (Page ID #59–60) (alleging that the civil-conspiracy claim is based on violations of Counts I and II).

Accordingly, because Plaintiffs' fraud and breach-of-fiduciary-duty claims are completely preempted, so too is Plaintiffs' civil-conspiracy claim.

## D.  Remaining Arguments for Remand

Finally, we affirm the district court's conclusions regarding Plaintiffs' remaining arguments for remand.  Plaintiffs assert:  (1) that remand is required in light of Michigan's criminal laws covering bribery, Appellant Br. at 32; and (2) that Plaintiffs' complaint raises breach-of-fiduciary-duty violations implicated by Section 9(a) of the National Labor Relation Act ("NLRA") that provide an independent basis on which to assert claims against Defendants, *see Pratt v. United Auto., Aerospace & Agric. Implement Workers of Am., Loc. 1435*, 939 F.2d 385, 388 (6th Cir. 1991), *see also* Appellant Br. at 37–38.[2]

First, we agree with the district court's analysis rejecting Plaintiffs' argument that remand is warranted based on Michigan criminal laws outlawing the taking of bribes.  *See* Appellant Br. at 32 (citing Mich. Comp. Laws § 750.125); *see also Baltrusaitis II*, 695 F. Supp. 3d at 918–19. A Michigan criminal statute does not create a private cause of action.  Nor does reference to a state's criminal laws provide an exception to complete preemption under § 301.  Plaintiffs' reliance on Seventh Circuit precedent for their position that remand is warranted based on a state criminal law is unpersuasive. *See* Appellant Br. at 34 (citing *S.C. Johnson & Son, Inc. v. Transp. Corp. of Am.*, 697 F.3d 544 (7th Cir. 2012)).  As the district court explained, *S.C. Johnson* "relates to preemption under the Federal Aviation Administration Authorization Act, and provides no guidance . . . as to any exception to preemption under § 301." *Baltrusaitis II*, 695 F. Supp. 3d at 919.  S.C. Johnson sought tort damages based on a bribery scheme, and the question before the Seventh Circuit was whether Wisconsin's bribery laws were sufficiently "tenuous, remote, or peripheral" to carrier "rates, routes, or services," so as to not be preempted under the FAAAA.  *S.C. Johnson*, 697 F.3d at 552 (quoting *Rowe v. New Hampshire Motor Transp. Ass'n*, 522 U.S. 364, 370–71 (2008)).  The Seventh Circuit held that S.C. Johnson could seek tort damages based on bribes taken because "the cash bribes that [an S.C. Johnson official] pocketed,

---

[2]Plaintiffs also argue that their claims should be remanded on the basis that their damages need not be calculated with reference to the terms of the CBA.  *See* Appellant Br. at 25.  This argument is unpersuasive because Plaintiffs' claims are preempted on other grounds.

for instance, need not have had any effect on the actual prices S.C. Johnson paid to its carriers." *S.C. Johnson*, 697 F.3d at 560. This rationale does not apply with equal force in the § 301 preemption context. As we have already explained, under *DeCoe*, the questions are whether a plaintiff's claim requires interpreting the terms of the CBA or whether the right at issue is created by the CBA. Even if Plaintiffs could allege damages that do not require reference to the terms of the CBA—analogizing to *S.C. Johnson*—Plaintiffs cannot escape the reality that, at bottom, their claims exist solely because of the CBA and their contractual relationship with Defendants.

Also, just as before the district court, Plaintiffs argue that *Farmer v. United Brotherhood of Carpenters & Joiners of America, Local 25*, provides a basis for remand by allowing for concurrent jurisdiction for state courts with federal courts. Appellant Br. at 36 (citing 430 U.S. 290, 301–05 (1977)). Once again, as the district court correctly held, the rules of preemption applied in *Farmer* are inapplicable here. *Baltrusaitis II*, 695 F. Supp. 3d at 918. *DeCoe* resolved this issue already. As we explained in *DeCoe*, "[t]he problem with relying on the *Farmer* test is that *Farmer* was not a 301 preemption case, but rather involved preemption under *San Diego Building Trades Council v. Garmon*." 32 F.3d at 219 (citing 359 U.S. 236 (1959)). "[T]he *Garmon* preemption test, which involves a balancing of state and federal interests, is inapplicable to section 301 preemption, which implicates Supremacy Clause concerns." *DeCoe*, 32 F.3d at 219.

Second, we reject Plaintiffs' position that because their arguments are analogous to a § 9(a) of the NLRA claim that their complaint should survive § 301 complete preemption. Appellant Br. at 37–38. Plaintiffs' reliance on § 9(a) of the NLRA is misplaced. As we explained in *Pratt*, § 9(a) of the NLRA "creates a duty of fair representation on the representative union" that "does not depend on the existence of a collective bargaining agreement." 939 F.2d at 388. "Section 9(a), in conjunction with 28 U.S.C. § 1337, creates a jurisdictional basis for actions for breach of the duty of fair representation independent of Section 301." *Id.* Had Plaintiffs intended to bring a federal action based on a duty of fair representation as enacted through § 9(a) of the NLRA their argument would be well-taken. Instead, Plaintiffs seek to avoid federal jurisdiction and complete preemption under § 301.

As we have already explained, Plaintiffs' claims are completely preempted under *DeCoe* steps one and two precisely because the rights at issue are created by the CBA. Accordingly, Plaintiffs' reference to § 9(a) of the NLRA is unavailing.

### III. CONCLUSION

For the reasons set forth above, we **AFFIRM** the district court.

---

**CONCURRENCE**

---

THAPAR, Circuit Judge, concurring in the judgment.  A union and a car company engaged in a massive bribery scheme.  As part of that scheme, the union stayed quiet when the car company transferred its employees to distant worksites.  Seeking to recover the financial losses they suffered because of this transfer, the employee-plaintiffs brought several state-law claims against their employer and union.  The majority holds that federal labor law preempts the plaintiffs' state-law claims.  I agree with that conclusion.  But because my reasoning differs from that of the majority, I respectfully concur in the judgment only.

I.

A.

The plaintiffs are thirty-eight current and former union members and automobile engineers.  They worked for FCA US, LLC, a Detroit car company formerly known as Chrysler Group.  The plaintiffs sued their union (the United Auto Workers), FCA, and various executives at the union and at FCA.

The complaint alleges that the union executives and FCA engaged in a sweeping bribery scheme.  This "infamous" scandal has resulted in multiple criminal convictions.  *Swanigan v. FCA US LLC*, 938 F.3d 779, 782 (6th Cir. 2019).  Only one alleged portion of that scheme is relevant here.

According to the complaint, FCA transferred the plaintiffs from Auburn Hills, Michigan, to a work site in Trenton, Michigan.  The company believed that it could reduce labor costs by doing so.  Normally, the plaintiffs' union would have contested the company's right to make that transfer under the collective bargaining agreement ("CBA").  But FCA paid bribes to the union's executives in exchange for company-friendly concessions.  And the plaintiffs claim that the union didn't contest the transfers because the union was in the company's pocket.

The transfer had many detrimental effects.  It added an hour to the plaintiffs' commutes, put wear and tear on their cars, and cost them money in gas.

The plaintiffs filed this lawsuit in state court alleging (1) fraud, against the union defendants; (2) breach of fiduciary duty, against the union defendants; and (3) civil conspiracy, against all defendants.

The defendants removed the action to federal district court.  The plaintiffs moved to remand, but the district court denied their motion.  The court held that, under the "complete preemption doctrine," the plaintiffs' state-law claims were really federal-law claims.  The plaintiffs eventually stipulated to the dismissal of those federal claims as time-barred by the statute of limitations.  The plaintiffs now appeal the dismissal of their claims, arguing that the district court shouldn't have converted their state-law claims into federal ones.

B.

Because the defendants removed the action to federal court, they bear the burden to establish federal subject-matter jurisdiction.  The defendants argue that we have federal-question jurisdiction under 28 U.S.C. § 1331.  Under the normal rules of federal jurisdiction, that wouldn't be true.  But the Supreme Court has identified an exception to those rules, called the "complete preemption" doctrine.  The question here is whether this doctrine provides for federal jurisdiction over the plaintiffs' claims.

1.

Start with the normal rules of federal-question jurisdiction.  Federal courts can hear a case if it raises an issue of federal law.  28 U.S.C. § 1331.  Under the long-established "well-pleaded complaint" rule, courts look only at the plaintiff's complaint to determine whether the case raises a federal-law issue.  A federal *defense* to a plaintiff's state-law claims isn't enough to create federal jurisdiction.  As the Supreme Court recently put it, the "plaintiff's own claims and allegations" are the key to federal-question jurisdiction.  *Royal Canin U.S.A., Inc. v. Wullschleger*, 145 S. Ct. 41, 47 (2025).  "If the complaint presents no federal question, a federal court may not hear the suit." *Id.*

Here, the plaintiffs' complaint doesn't present any federal-law issues.  The complaint brings state-law claims that raise issues of state law.  To be sure, the defendants have raised a federal-law defense:  they argue that section 301 of the Labor Management Relations Act preempts the plaintiffs' claims.  But affirmative defenses like preemption don't transform state-law claims into federal claims.  *Id.*  And looking at the plaintiffs' complaint, without regard to any possible defenses, no federal-law issue exists.  So under the normal rules, a federal court "may not hear the suit."  *Id.*

But the normal rules don't apply when a defendant claims section 301 preemption. Decades ago, the Supreme Court held that section 301 has an "unusually powerful pre-emptive force"—a force so powerful that any plaintiff who brings a state-law claim preempted by section 301 is deemed to have brought a *federal-law claim* that is removable to federal court.  *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 7 (2003) (discussing *Avco Corp. v. Machinists*, 390 U.S. 557 (1968)).  It's not clear why the preemptive force of § 301 is somehow more "powerful" than the preemptive force of other federal laws.  Nothing in the provision's text suggests that it is.  *See* 29 U.S.C. § 185(a).  The Supreme Court has simply said so.

In any event, this "complete preemption" doctrine requires federal courts "to recast ostensibly state causes of action as federal causes of action."  *Dillon v. Medtronic, Inc.*, 992 F. Supp. 2d 751, 757 (E.D. Ky. 2014) (Thapar, J.).  The effect of the complete preemption doctrine is to "ensure[] that the preemption question itself is decided in a federal (rather than a state) forum."  *Cook v. Rockwell Int'l Corp.*, 790 F.3d 1088, 1097 (10th Cir. 2015) (Gorsuch, J.).

I've previously criticized this doctrine for allowing judges to "usurp[] the plaintiff as master of the complaint" in contravention of the longstanding well-pleaded complaint rule. *Dillon*, 992 F. Supp. 2d at 757.  As Justice Scalia put it, the complete preemption doctrine is the product of "jurisdictional alchemy."  *Beneficial Nat'l Bank*, 539 U.S. at 14 (Scalia, J., dissenting).  An invalid state-law claim is a state-law claim nonetheless.  *Id.* at 18.  And "[t]he proper response to the presentation of a nonexistent claim to a state court is *dismissal*" by the state court.  *Id.* (emphasis in original).  But because we're bound to follow Supreme Court precedent, our court must join in the "federalize-and-remove dance" that the complete preemption doctrine requires.  *Id.*

Applying that framework means that federal jurisdiction turns on one question: does section 301 of the Labor Management Relations Act preempt the plaintiffs' state-law claims? If not, then there's no basis for federal subject-matter jurisdiction. The claims would be remanded to state court. But if section 301 does preempt the state-law claims, they'll be converted into federal-law claims under section 301. And if they're converted into federal-law claims, they'll be dismissed on statute-of-limitations grounds, as even the plaintiffs have acknowledged.[1]

## II.

I agree with the majority that section 301 preempts the plaintiffs' state-law claims. But I arrive at that conclusion by a different path.

## A.

Section 301 deals with labor contracts. It preempts any state-law claim "alleging a violation of a provision of a labor contract," including a collective bargaining agreement. *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 210 (1985). Section 301 governs all claims that are either (1) "substantially dependent on analysis of a collective-bargaining agreement" or (2) "founded directly on rights created by collective-bargaining agreements." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 394 (1987) (citation omitted). This rule springs from the Court's conclusion that Congress "intended doctrines of federal labor law uniformly to prevail over" a patchwork of state laws that might give "different meanings" to "individual contract terms." *Loc. 174, Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Lucas Flour Co.*, 369 U.S. 95, 103–04 (1962).

In light of these principles, our precedent says section 301 preempts two classes of state-law claims. *DeCoe v. Gen. Motors Corp.*, 32 F.3d 212, 216 (6th Cir. 1994). First, section 301 preempts state-law claims that require a court to interpret the terms of a collective bargaining agreement. *Id.* This is "*DeCoe* step one." Second, section 301 preempts any state-law claim

---

[1]In fact, the plaintiffs previously filed a federal lawsuit that asserted federal-law claims under section 301. But the plaintiffs waited too long to file that lawsuit, and it was dismissed on statute-of-limitations grounds. The same fate awaits plaintiffs' current lawsuit if the state-law claims are converted into federal claims under section 301.

that seeks to vindicate a right created by a collective bargaining agreement. *DeCoe*, 32 F.3d at 216. This is "*DeCoe* step two."

Although *DeCoe* conceived of its framework as two "steps," it makes more sense to consider those steps in reverse order, as our court has done before. I would first ask whether the CBA created the rights that the plaintiffs claim. If so, then the claims are preempted under *DeCoe* step two. *Id.* (asking whether "the right claimed by the plaintiff is created by the collective bargaining agreement or by state law"). But if not—that is, if state law (not the CBA) created the rights at issue—then the plaintiffs' claims are preempted "only if resolving the claims would require a court to interpret the CBA." *Odell v. Kalitta Air, LLC*, 107 F.4th 523, 531 (2024). That's *DeCoe* step one. *DeCoe*, 32 F.3d at 216.

*DeCoe* step two applies primarily to breach-of-contract claims. *DeCoe*'s second step governs claims for breaches of contractual duties created by a voluntary collective bargaining agreement. Private parties can create rights and obligations for themselves by entering a contract. But when the relevant contract is a collective bargaining agreement, then federal law—not state law—must govern any claim for a breach of that contract. *DeCoe*, 32 F.3d at 216.

*DeCoe* step one, by contrast, applies mainly to tort claims seeking compensation for breaches of mandatory duties created by state law. If the plaintiff can't prove all the elements of his tort claim unless the court examines the terms of the collective bargaining agreement, the claim is preempted. *Adamo Demolition Co. v. Int'l Union of Operating Eng'rs*, 3 F.4th 866, 873 (6th Cir. 2021). For example, suppose an employee brings a state-law tort claim for retaliatory discharge. *See Beckwith v. Diesel Tech. Co.*, No. 99-1548, 2000 WL 761808, at *3 (6th Cir. May 30, 2000) (table). And suppose that proving this claim would require the employee to show that the collective bargaining agreement didn't let the employer fire the plaintiff. *Id.* Such a claim would fail under the first prong of the *DeCoe* test. *Id.* It requires a court to look at the collective bargaining agreement. Notably, such a claim would not be preempted under *DeCoe* step two. It doesn't seek to vindicate a right that comes from a collective bargaining agreement. Instead, it seeks to vindicate a right that comes from state tort law: the right not to be fired for retaliatory reasons.

To determine which *DeCoe* step applies, we must look beyond the label that a plaintiff attaches to his claim. *Adamo*, 3 F.4th at 873 (6th Cir. 2021). We must "look[] to the essence" of the plaintiff's claim to determine whether the plaintiff "is attempting to disguise what is essentially a contract claim as a tort." *DeCoe*, 32 F.3d at 216. For example, if a plaintiff alleges that a defendant committed "fraud" against him by breaching its obligations under a collective bargaining agreement, the plaintiff is really bringing a breach-of-contract claim—even though he's labeled it as a tort claim for fraud. *Fox v. Parker Hannifin Corp.*, 914 F.2d 795, 802 (6th Cir. 1990). Such a claim would be preempted under *DeCoe*'s second step.

B.

Applying the *DeCoe* framework to the plaintiffs' claims, the fraud claims are not preempted under *DeCoe* step two. The plaintiffs are bringing tort claims for the breach of a mandatory duty not to commit fraud. The plaintiffs seek to vindicate their right to be free from fraudulent misrepresentations that cause loss. Michigan state law, not the collective bargaining agreement, created those rights. But the fraud claims *are* preempted under *DeCoe* step one. For the plaintiffs to vindicate this state-law right, the court would have to examine the collective bargaining agreement.

As to the claim for breach of fiduciary duty, I agree with the majority that it is preempted under *DeCoe* step two. Although this sounds like a tort claim, it's really a claim for breach of the collective bargaining agreement.

1.

The plaintiffs' first claim is a state-law claim for silent- and positive-fraud against the UAW defendants. These claims seek to vindicate a right created by state law. The plaintiffs would have these claims even if they didn't have a collective bargaining agreement. Even so, section 301 preempts the claims. Why? Because for the plaintiffs to prevail on the merits of their fraud claims, a court would need to look at the terms of their collective bargaining agreement with the union.

a.

*DeCoe* step two does not preempt the plaintiffs' fraud claims. A claim is preempted under *DeCoe* step two only if the state-law claim seeks to vindicate a right created by the collective bargaining agreement. *DeCoe*, 32 F.3d at 216. But here, the plaintiffs are asserting a right to be free from fraudulent misrepresentations that caused them loss. The collective bargaining agreement didn't create that right—state law did. *See Hyten*, 817 N.W.2d at 567–68 (defining Michigan's law of fraud). The duty not to defraud is a universal duty that applies to everyone, not just people who are parties to a collective bargaining agreement. It's a mandatory duty that state law imposes—not a voluntary duty that parties can create or modify by contract. And section 301 doesn't automatically preempt Michigan's law of fraud whenever a union worker sues his employer. Fraud that is "independent of [collective bargaining agreement] rights and duties" can "unquestionably" evade "the preemptive reach of section 301." *Fox*, 914 F.2d at 801. In short, by bringing this fraud claim, the plaintiffs are seeking to vindicate rights created by Michigan law. They could do so (without facing preemption) if their claim didn't require a court to interpret the collective bargaining agreement.

In concluding otherwise, the majority misunderstands the source of the rights that the plaintiffs are claiming. The majority says that the plaintiffs' fraud claims are "resolved neatly" by *Fox*, 914 F.2d 795, and *Terwilliger v. Greyhound Lines, Inc.*, 882 F.2d 1033 (6th Cir. 1989). Majority Op. at 12. Not so. In both those cases, the plaintiffs weren't bringing real tort claims at all; they were bringing breach-of-contract claims *disguised* as tort claims. Here, by contrast, the plaintiffs are bringing genuine tort claims asserting violations of a right created by state law—not violations of a right created by the collective bargaining agreement.

In *Fox*, the plaintiff advanced a "nebulous fraud claim" that "merely alleged that the Company and the Union engaged in fraudulent malfeasance of CBA obligations." 914 F.3d at 801–02. We determined that the plaintiff wasn't bringing a fraud claim at all. Instead, the *Fox* plaintiff had re-packaged what was really a breach-of-contract claim—for violations of "CBA obligations"—into a claim for fraud. *Id.* Similarly, in *Terwilliger*, a union member who had been on disability status claimed that his collective bargaining agreement gave him a contractual right to have his employer re-hire him full time. 882 F.2d at 1035–36. So he filed a claim for

"fraud." But we held that this was really a breach-of-contract claim in disguise. *Id.* at 1037. The plaintiff "essentially" alleged that the employer "violated the provisions of the collective bargaining agreement." *Id.* Indeed, the only basis for the alleged right-to-reinstatement claimed by the plaintiff was the collective bargaining agreement. *Id.* at 1038.

Here, by contrast, the plaintiffs are bringing genuine fraud claims—not disguised breach-of-contract claims. Unlike the claims in *Fox* and *Terwilliger*, the plaintiffs' fraud claims don't allege that the union officials committed "fraud" by breaching their obligations under the collective bargaining agreement. *See Fox*, 924 F.3d at 801. Rather, the plaintiffs allege that the union officials committed fraud by lying to the plaintiffs about what the union officials were doing. The plaintiffs allege that "while [their] grievances were being processed," the union officials "made positive representations" that they were advocating for the grievances—when in fact they were not, since they had already "withdrawn or dismissed the grievances." R. 1, Pg. ID 54.

The defendants' alleged statements—that they were advocating for the plaintiffs—were either true or false, no matter what the collective bargaining agreement says. *Id.* Put differently, whether the defendants falsely stated that they were taking certain actions on the plaintiffs' behalf (when they were not doing those things at all) is a factual question that can be resolved without interpreting the CBA. If the defendants had already "withdrawn or dismissed the grievances" when they told the plaintiffs that they were *supporting* the grievances, then that was an obvious lie—no matter what the CBA says. *Id.* Thus, the plaintiffs have alleged a breach of a mandatory state-imposed legal obligation—"don't tell lies that cause financial loss"—that exists independently of the CBA. These fraud claims are a far cry from the disguised breach-of-contract claims in *Fox* and *Terwilliger*.

b.

Unlike *DeCoe*'s second step, *DeCoe* step one *does* preempt the plaintiffs' fraud claims. Proving the elements of these claims would require a court to interpret the collective bargaining agreement. *DeCoe*, 32 F.3d at 216. Under Michigan law, a positive fraud claim has six elements: "(1) that defendant made a material representation; (2) that it was false; (3) that when

he made it he knew that it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury." *Titan Ins. Co. v. Hyten*, 817 N.W.2d 562, 567–68 (Mich. 2012) (citation omitted). Silent fraud is similar, except the plaintiffs need to show that the defendants failed to disclose a fact in violation of a legal duty to disclose. *Hord v. Env't Rsch. Inst. of Mich.*, 617 N.W.2d 543, 550 (Mich. 2000) (per curiam).

The plaintiffs founder on the sixth element of Michigan fraud, which requires them to prove that they suffered loss because of their reliance on the defendants' false representations. *Diem v. Sallie Mae Home Loans, Inc.*, 859 N.W.2d 238, 244 (Mich. Ct. App. 2014). Even if we assume that the plaintiffs relied on the union's misrepresentations, and even if we assume that the plaintiffs suffered financial loss, they can't show that their reliance *caused* the loss—as required under the sixth element of Michigan fraud—unless they can show that their grievances had merit. But to determine whether their grievances had merit, a court would need to examine the collective bargaining agreement.

To see why, consider the plaintiffs' theory of fraud. As for the loss element, the plaintiffs' claimed losses stem from the transfer to an inconvenient worksite. The transfer caused them financial damage: increased fuel costs and wear and tear on their cars. As for the reliance element, the plaintiffs claim that they relied on the union executives' representations that they were advocating for the plaintiff's labor grievances contesting the transfers. What's the connection between the two? According to the plaintiffs, their reliance on the misrepresentations prevented them from replacing the corrupt union officials with honest ones who would have faithfully advocated for their grievances. And if the plaintiffs had honest representation for their grievances, they say, FCA wouldn't have made the transfers—meaning the plaintiffs wouldn't have suffered any financial losses from an increased commute time.

But there's a problem with that logic. The only way to know whether honest union officials would have advocated for the grievances is to determine whether the grievances had merit. And the only way to know whether the grievances had merit is to read the collective bargaining agreement. For example, suppose that the collective bargaining agreement gave FCA

a right to implement the transfers. In that case, the grievances would be meritless—and honest union officials wouldn't advocate for them. In fact, advocating for frivolous grievances would waste union resources. *See Vaca v. Sipes*, 386 U.S. 171, 191–92 (1967).

In sum, the key question for the plaintiffs' loss-causation theory is whether their grievances had merit. If they did, then honest union representatives would have pursued them, which could have stopped the transfers. If they didn't, then FCA would have implemented the transfers regardless. But to answer that question, "[a] reviewing court will plainly have to interpret the terms of the [CBA] to determine the scope of the Union's responsibilities" concerning the grievances. *Adamo*, 3 F.4th at 874. It doesn't matter what the collective bargaining agreement actually says. Either way, the mere fact that a court would need to read that document means that section 301 preempts the claims. *DeCoe*, 32 F.3d at 216. Thus, the fraud claims are preempted under *DeCoe* step one. *See id.*

c.

Although the majority and I agree that the plaintiffs' fraud claims are preempted under *DeCoe* step one, the majority concludes that the fraud claims are also preempted under *DeCoe* step two. But since the plaintiffs' fraud claims seek to vindicate independent state-law rights (as opposed to rights created by the CBA), they must be preempted under *DeCoe* step one, if at all.

Our circuit illustrated this point last year in *Odell v. Kalitta Air, LLC*. 107 F.4th 523 (6th Cir. 2024). There, a group of airline pilots sued their employer for illegal discrimination in violation of Title VII of the Civil Rights Act of 1964 and the Americans with Disabilities Act. 107 F.4th 523, 526 (6th Cir. 2024). The question for us was whether the parties' collective bargaining agreement precluded the district court from entertaining these claims, which would otherwise be subject to arbitration. *Id.* at 530. In evaluating the plaintiffs' claims, we used the same *DeCoe* framework that applies to the present case. *Id.* at 530 & n.7. Applying *DeCoe*, the *Odell* court endorsed what today's majority rejects: claims to vindicate violations of universal duties created by legislatures must be preempted under *DeCoe* step one, if at all. As the *Odell* court explained: "The Pilot Plaintiffs' claims under Title VII and the ADA are created by federal law, rather than the CBA, and are precluded only if resolving the claims would require a court to

interpret the CBA." *Id.* at 531. *Odell* then held that the Title VII and ADA claims were precluded under *DeCoe*, since resolving those claims would "necessarily require a court to interpret the CBA." *Id.* at 532.

That is exactly how I would resolve the present case. I would hold that the plaintiffs' "claims under [Michigan's fraud law] are created by [Michigan] law, rather than the CBA, and are precluded only if resolving the claims would require a court to interpret the CBA." *Id.* As *Odell* explained, it makes no difference that our case involves state-law claims, whereas *Odell* involved federal-law claims. "Principles of federalism demand no less caution in finding that a federal statute pre-empts state law" than the caution we must exercise in finding that a federal statute precludes federal causes of action. *Odell*, 107 F.4th at 529 n.6 (quoting *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 259 n.6 (1994)). For that reason, I would hold that the plaintiffs' fraud claims are *not* preempted under *DeCoe* step two, because state law—not the CBA—created the right to be free from fraud. *Supra* at 28–29. As it happens, the fraud claims *are* preempted under *DeCoe* step one, since resolving those claims would require interpreting the collective bargaining agreement. *Supra* at 29–31.

In sum, my position is simple: the underlying right that the plaintiffs seek to vindicate—the right to be free from fraud—was created by a mandatory tort law, not a voluntary contractual duty. So the fraud claims are not preempted under *DeCoe* step two. But in this case, resolving the particular fraud claims that the plaintiffs have brought would require a court to interpret the CBA. So the claims are preempted under *DeCoe* step one.

\* \* \*

Ultimately, the majority goes astray because it misunderstands the source of plaintiffs' claimed rights. For the majority, "the CBA created the rights at issue." Majority Op. at 13. But the "rights at issue" are the rights to be free from fraudulent misrepresentations that cause loss. State law, not the collective bargaining agreement, created those rights. *Odell*, 107 F.4th at 530 (recognizing that the plaintiffs' "claims under Title VII and the ADA are created by federal law, rather than the CBA"). That's why the analysis should turn on *DeCoe* step one. *Id.* (explaining that claims created by federal law were preempted "only if" resolving those claims required

interpreting the CBA).  If the elements of Michigan fraud were slightly different—for example, if Michigan law didn't require the plaintiffs to show that their reliance on the defendants' misrepresentations *caused* their losses—then the plaintiffs could vindicate their state-law rights without asking a court to interpret the collective bargaining agreement.  But the majority would hold the fraud claims preempted in any event.  This holding disables the state of Michigan from giving its workers an independent right to be free from this type of fraudulent conduct.  For that reason, as to the plaintiffs' fraud claims, I respectfully concur in the judgment only.

2.

The plaintiffs also bring claims for breaches of fiduciary duty.  These claims are preempted under *DeCoe* step two.  Although these claims might look like tort claims at first glance, they're really claims that the defendants breached their contractual duties to faithfully advocate for the plaintiffs' grievances.  That's a breach-of-contract claim, and *DeCoe* step two preempts it.

To establish a breach of fiduciary duty under Michigan law, a plaintiff must prove three elements:  "(1) the existence of a fiduciary duty; (2) a breach of that duty; and (3) damages caused by the breach of that duty."  *Highfield Beach at Lake Mich. v. Sanderson*, 954 N.W.2d 231, 247 (Mich. Ct. App. 2020) (citation omitted).

The plaintiffs' complaint alleges that, by corruptly failing to advocate for the plaintiffs' grievances, the union officials breached various duties of loyalty.  Plaintiffs characterize the relevant "duty" as a duty "to employ due diligence to advocate for the Plaintiffs' legitimate grievances opposing their transfers."  R. 1, Pg. ID 56, ¶ 156.  The union defendants allegedly breached their duty by taking bribes "for [the] purpose" of "taking company-friendly positions on labor disputes, including the grievances filed by the Plaintiffs."  *Id.* at Pg. ID 57, ¶ 158.  This decision caused "unjustified negative decisions on the Plaintiff's grievances, including the dismissal and withdrawal of those grievances."  *Id.* at Pg. ID 57, ¶ 159.

But the plaintiffs run into a problem:  section 301 preempts state-law claims alleging that a union failed to properly advocate for grievances.  The plaintiffs' claimed right—the right to have their grievances fairly processed—comes from the collective bargaining agreement.

So section 301 preempts any state-law claim to vindicate that right. *DeCoe*, 32 F.3d at 216. In fact, the plaintiffs themselves concede this point. In their brief, they acknowledge that section 301 "completely pre-empts" a "claim for a union's breach of the duty of fair representation regarding a union's acts or omissions in connection with a labor grievance." Appellants' Br. at 37.

But on appeal, the plaintiffs try a different tack. They attempt to characterize their complaint as alleging a *different* breach of duty—one that's unrelated to labor grievances. Pointing to paragraph 158 of the complaint, the plaintiffs argue that their allegation that the union defendants took bribes amounts to a "separate and independent claim or cause of action" for "breach of fiduciary duty" that is "not associated with grievance procedures." *Id.* at 38.

But that's not a fair reading of the complaint. Count II of the complaint, called "breach of fiduciary duty," focuses entirely on the union officials' corrupt failure to advocate for plaintiffs' grievances. R. 1, Pg. ID 56–57. In paragraph 158, the complaint alleges the union officials accepted bribes "for [the] purpose" of "taking company-friendly positions" on "the grievances filed by the Plaintiffs." *Id.* at Pg. ID 57. Far from amounting to a "separate and independent claim" that doesn't relate to grievances, paragraph 158 plainly asserts that the union executives breached their duty by corruptly failing to advance plaintiffs' grievances.

In sum, the plaintiffs' claim for breach of fiduciary duty asserts that the union executives breached their duty to advocate for plaintiffs' grievances. But any such duty springs from the collective bargaining agreement. If the collective bargaining agreement didn't exist, the plaintiffs wouldn't have this claim. Thus, the claim is preempted under *DeCoe* step two. *DeCoe*, 32 F.2d at 216.

## C.

As for the remaining issues: I agree with the majority that the plaintiffs' civil-conspiracy claim is preempted, since it's derivative of their other two claims. *See DeCoe*, 32 F.3d at 217 (holding that a "civil conspiracy claim" was preempted because it was "derivative" of other preempted state-law claims). I also agree that the plaintiffs' reliance on Mich. Comp. Laws § 750.125, a Michigan criminal law prohibiting bribery, is misplaced. That criminal statute

doesn't give plaintiffs a private right of action, and the scope of section 301 preemption does not depend on whether Michigan has criminalized bribery. Finally, the plaintiffs' citations to section 9(a) of the National Labor Relations Act don't change the preemption analysis. Whatever duties that provision imposes on union executives, the plaintiffs didn't plead a violation of those duties in their complaint. Instead, they pleaded that the union executives breached Michigan fiduciary duties by failing to advocate for their grievances—a claim that section 301 preempts.

\*     \*     \*

I agree that section 301 of the Labor Management Relations Act preempts the plaintiffs' claims. But I reach that conclusion by a different path than the majority. Thus, I respectfully concur in the judgment only.